# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARETTE SMITH, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SPECIALIZED LOAN SERVICING, LLC,<br><br>Defendant. | CASE NO. 16cv2519-GPC(BLM)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>[Dkt. No. 8.] |

Before the Court is Defendant's motion to dismiss for failure to state a claim. (Dkt. No. 8.) Plaintiff filed an opposition and Defendant filed a reply. (Dkt. Nos. 14, 15.) Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss with leave to amend.

## Background

Plaintiff Margarette Smith ("Plaintiff" or "Smith") filed a purported class action complaint against Defendant Specialized Loan Servicing, LLC ("Defendant" or "SLS") for alleged violations of Regulation X of the Real Estate Settlement Procedures Act ("RESPA"), 12 C.F.R. §1024.41; the California Consumers Legal Remedies Act ("CLRA"), and California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code 17200 *et seq.* (Dkt. No. 1, Compl.)

- 1 -

Plaintiff owns the subject real property located at 2453 Blackton Drive, San Diego, CA 92105. (Id. ¶ 69.) On October 13, 2005, Smith obtained a residential mortgage adjustable rate loan from IndyMac Bank, F.S.B. ("IndyMac") in the amount of $220,000. (Id. ¶ 70.)

Smith is an eighty-eight year old woman who suffers from dementia. (Id. ¶ 7.) A durable power of attorney was executed in May 2005 where Smith's daughter, Lynette Ethan-Groza, was granted the authority to manage Smith's affairs. (Id.) In August 2016, after the death of Lynette Ethan-Groza, Zarah Kimble, Lynette's daughter and Smith's granddaughter, became the successor to the power of attorney. (Id.)

From December 2013 until February 2014, Plaintiff did not pay her mortgage payments due to a family emergency. (Id. ¶ 71.) When the family crisis had passed, Smith sought a repayment plan that would allow her to prepay the amounts past-due. (Id.) In a letter dated February 11, 2014, IndyMac confirmed the details of a six-month repayment plan which called for six monthly payments of $826.88. (Id. ¶ 72.) Despite the confirmation of a repayment plan, IndyMac sent letters to Smith dated February 18, March 5, April 4, and April 15, 2014 informing Plaintiff that her loan was in default and invited her to explore repayment and loan modification options. (Id. ¶ 73.) After calling and emailing IndyMac concerning her repayment plan, around April 23, 2014, Smith submitted a formal Request for Mortgage Assistance ("RMA"), her first loss mitigation application pursuant to 12 C.F.R. § 1024.41. (Id. ¶ 74.) Instead of responding to the RMA, in a letter dated May 3, 2014, IndyMac stated Smith's loan was in serious default and threatened foreclosure. (Id. ¶ 75.) Two days later, IndyMac sent another letter inviting her to explore a repayment plan or a loan modification. (Id.) Then in a letter dated May 16, 2014, IndyMac informed Smith that her loan was being transferred to SLS effective June 1, 2014. (Id. ¶ 76.)

Her first correspondence from SLS was around June 12, 2014 when SLS informed Smith of her delinquency and encouraged her to apply for loss mitigation programs offered by SLS to prevent foreclosure; there was no mention of IndyMac's

repayment plan or the loan modification application she submitted to IndyMac. (Id. ¶ 78.)

**A. First Loss Mitigation Application with SLS**

In response to SLS's letter, Smith resubmitted her loss mitigation application around July 1, 2014 with a letter specifically asking whether SLS would let her know if any additional documentation was required. (Id. ¶ 79.) In violation of RESPA, SLS did not inform Smith in writing within 5 days after receiving her loss mitigation application that it received the application and whether the application was complete or incomplete. (Id. ¶ 82.) Instead, SLS sent two letters dated August 19, 2014. The first letter acknowledged receipt of her application without informing her whether the application was complete or incomplete. (Id. ¶ 83.) The letter also stated that SLS was in the process of reviewing the application and may contact her if the application is determined to be incomplete. (Id.) The second letter indicated two documents were missing from Smith's application.[1] (Id. ¶ 84.) Then around September 23, 2017, SLS informed Smith that she had not been evaluated for a loan modification or repayment program because she failed to provide the required documents but the letter did not identify which documents were missing or when SLS had requested them, if ever. (Id. ¶ 87.)

Around November 7, 2014, SLS sent Smith a letter encouraging her to apply for loss mitigation options similar to the initial June 12, 2014 letter. (Id. ¶ 88.) Around December 11, 2014, SLS sent Smith another letter informing her that her mortgage was in serious default, threatening foreclosure, and invited her to contact SLS to discuss repayment plans. (Id. ¶ 89.)

**B. Second Loss Mitigation Application with SLS**

On December 16, 2014, Plaintiff submitted another loan modification application. (Id. ¶ 90.) Around December 15, 2014 and again on December 22, 2014,

---

[1]The two missing documents were Smith's social security income information and Zarah Grooa's (sic) paystubs. (Dkt. No. 1, Compl. ¶ 84.)

- 3 -

SLS sent letters identical to the letter of August 19, 2014 in which SLS stated that her application was under review without specifying whether the application was complete or not. (Id. ¶ 91.) Around December 22, 2014, SLS sent a second letter that SLS had received a letter from Smith about her loan and it would submit a response within 30 business days. (Id. ¶ 92.) On December 30, 2014, SLS informed Smith that her application was missing two documents.[2] (Id. ¶ 94.) The next day, Smith faxed the missing documents to SLS on December 31, 2014. (Id.) On or about January 19, 2015, SLS sent a letter denying her application because she failed to provide the requested documents. (Id. ¶ 102.) From December 31, 2014 when Plaintiff faxed SLS the missing documents and while her application was under review, until the denial of her application on January 19, 2015, Plaintiff received five contradictory and conflicting letters regarding the status of her loan. (Id. ¶¶ 95-101.) For example, on January 5, 2015, SLS informed Smith that her account was past due and encouraged her to contact SLS to discuss possible loss mitigation options. (Id. ¶ 95.) The next day, SLS sent Smith a letter informing her that her application was under review. (Id. ¶ 96.) But then on January 7, 2015, SLS sent Smith a "Notice of Default and Notice of Intent to Foreclose" which stated that she had 33 days to pay all past due amounts. (Id. ¶ 97.) Additional letters were sent with conflicting information on January 14, 2015 and January 15, 2015. (Id. ¶¶ 99-101.)

Subsequent to the denial of the December 16, 2014 application on January 19, 2015, and prior to her next loss mitigation application submission on May 14, 2015, Plaintiff received conflicting letters similar to the ones described above. (Id. ¶¶ 103-111.)

**C.    Third Loss Mitigation Application with SLS**

On May 14, 2015, Smith faxed a new, complete RMA and supporting materials to SLS. (Id. ¶ 111.) In a letter dated June 12, 2015, SLS informed Smith that it needed

---

[2] The missing documents were tax returns and Form 4506T for Smith and Zarah Groca's (sic) paystubs. (Dkt. No. 1, Compl. ¶ 94.)

- 4 -

a couple of documents. (Id. ¶ 115.) Plaintiff faxed the additional responsive information around June 26, 2015. (Id.) Then, on July 1, 2015, SLS informed Smith, for the first time, that it required a Dodd Frank Certification concerning financial contributors. (Id. ¶ 118.) In a letter dated July 21, 2015, SLS indicated it had not evaluated her account for any loss mitigation options because she failed to provide all necessary documentation. (Id. ¶ 120.) Then in a letter dated September 14, and 21, 2015, SLS identified five documents that were supposedly missing from her application. (Id. ¶ 124.) A letter from SLS dated November 11, 2015 informed Smith that it evaluated her request for loan assistance and it was denied because of undisclosed requirements by the investor and the net present value calculation. (Id. ¶ 134.) Again, from May 14, 2015, when Plaintiff submitted her application until November 11, 2015, when SLS denied her application, Plaintiff received a deluge of conflicting letters from SLS informing her that her application was under review, informing her that she was in default and SLS intended to foreclose, and informing her that her mortgage was in serious default and inviting her to discuss alternative payment plans. (Id. ¶¶ 112, 113, 116-117, 119, 121, 122, 123, 125, 126, 127, 132.)

**D.     Fourth Loss Mitigation Application with SLS**

On November 19, 2015 Smith contacted SLS to pursue a secondary review but in a letter dated December 2, 2015, SLS told Smith that it conducted a further review and found her denial of her request for mortgage assistance was proper. (Id. ¶ 142.) The letter explained that SLS did not consider the contributor income because the contributor, Smith's granddaughter, [Zarah Kimble] did not reside at the property and invited Smith to submit a new RMA for consideration. (Id.) Plaintiff immediately filed a new RMA. (Id.) In a letter dated December 22, 2015, SLS informed Smith she needed Kimble's paystubs. (Id. ¶ 143.) On January 20, 2016, Smith faxed SLS Kimble's paystubs. (Id. ¶ 145.) In a letter dated February 1, 2016, SLS requested the paystubs again. (Id.)

In early March 2016, Smith received a property valuation report which was

conducted as part her request for mortgage assistance. (Id. ¶ 146.) Two weeks after receiving the property valuation report, around March 17, 2016, Smith received a letter informing her that her loan was in serious default and was referred to foreclosure. (Id. ¶ 148.) In letters dated May 15 and 17, 2016, SLS told Smith that her application was under review and referred her to the RMA form for a list of required documents without stating which documents were missing. (Id. ¶149.) A May 18, 2016 letter indicated she failed to provide proof of her social security income, when in fact she had previously submitted that document. (Id. ¶ 150.) The May 18th letter asked that the document be provided by June 17, 2016. (Id.) A letter dated May 25, 2016 informed Smith that her account had been referred to foreclosure, and stated that it was unable to review the account to determine the appropriate program until receipt of a complete "financial information package, with all supporting documentation." (Id. ¶ 151.) The letter also provided a breakdown of assessed fees to Smith's account to include $4,909.63 in foreclosure fees/costs; $249.70 in property inspections; $25.00 for payoff statement and $11.00 on corporate advances for a total of $5,195.33. (Id. ¶ 152.) A June 3, 2016 letter again requested proof of Plaintiff's social security income by June 17, 2016. (Id. ¶ 153.) On June 17, 2016, SLS sent her another letter stating that her application is in the process of being reviewed. (Id.) In a latter dated August 18, 2016, SLS stated it conducted a review of Smith's loan modification request but did not evaluate her eligibility because she did not provide the required documents. (Id. ¶ 157.) According to Plaintiff, SLS's letters from May - August 2016 indicate that it was dual tracking[3] her loan in violation of RESPA. (Id. ¶ 158.)

Plaintiff filed the instant complaint on October 7, 2016. (Dkt. No. 1.) Defendant filed a motion to dismiss all causes of action alleged against it. (Dkt. No. 8.) Plaintiff filed an opposition to the RESPA and UCL claims. However, Plaintiff does not oppose

---

[3]"Dual tracking" occurs when a servicer is negotiating with defaulted homeowners on their loans for a loan modification while also initiating the foreclosure process. See Gelinas v. Bank of America, N.A., No. 16-1355-RAJ, 2017 WL 1153859, at *4 (W.D. Wash. Mar. 28, 2017).

Defendant's motion concerning the CLRA claim and withdraws her CLRA claim. (Dkt. No. 14 at 30 n. 10.) Accordingly, the Court GRANTS Defendant's unopposed motion to dismiss the CLRA claim.

## Discussion

### A. Legal Standard on Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff. al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009). The court evaluates lack of statutory standing under the Rule 12(b)(6) standard. Maya v. Centex

1 Corp., 658 F.3d 1060, 1067 (9th Cir. 2011).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. See Desoto, 957 F.2d at 658; Schreiber, 806 F.2d at 1401.

## B. Requests for Judicial Notice

Defendant and Plaintiff filed requests for judicial notice. (Dkt. Nos. 10, 14-1.) As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). However, a district court may consider "material which is properly submitted as part of the complaint" or if the documents are not attached to the complaint, they may be considered if the documents' "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies" on them. Id. (citations omitted). In addition, a court may take judicial notice of "matters of public record" under Rule 201. Id. at 688-89.

Here, both parties seek judicial notice of the Deed of Trust recorded on October 20, 2005. Plaintiff also seeks judicial notice of SLS's May 25, 2016 letter to Ms. Ethan-Groza, which is incorporated by reference in the complaint. Because neither party has filed an opposition to either party's request for judicial notice, and the Court finds it appropriate to take judicial notice of the deed of trust, a publically recorded document, and the May 25, 2017 letter which is incorporated by reference in the complaint, the Court GRANTS Defendant and Plaintiff's requests for judicial notice of these two documents.

Plaintiff also seeks judicial notice of a print out from the San Diego County Recorder's Office website indicating that a notice of default was filed on September 29,

2016 on Smith's property. However, the print out does not identify the property subject to the notice of default. While Defendant does not oppose the request for judicial notice, the Court declines to take judicial notice of the print out from the San Diego County Recorder's Office, and DENIES Plaintiff's request for judicial notice.

**C.     Regulation X of RESPA**

The complaint alleges a violation of Regulations X; specifically, it alleges a violation of 12 C.F.R. § 1024.41(b)(2)(i) requiring a servicer to notify the borrower within five days after receiving a loss mitigation application that it received the application and whether it is complete; 12 C.F.R. § 1024.41(c) requiring a servicer, once a complete application is received, to evaluate and provide the borrower with loss mitigation options, if any, it will offer within 30 days after receiving the loss mitigation application; and 12 C.F.R. § 1024.41(f) prohibiting a servicer from initiating foreclosure proceedings while a loss mitigation application is pending. (Dkt. No. 1, Compl. ¶¶ 182-185.)

**1.     Standing**

As a threshold inquiry, Defendant argues that Plaintiff lacks statutory standing to bring her claim under Regulation X of RESPA because it applies only to a "mortgage loan that is secured by a property that is a borrower's principal residence", 12 C.F.R. § 1024.30(c), and because Plaintiff has not asserted that she maintained the property as her principal residence at the time she submitted her application, she lacks statutory standing. Plaintiff opposes presenting facts, outside the complaint, that Plaintiff lived in the home until around October 2015 at which point she moved into a nursing care facility. (See Dkt. No. 14 at 18; Dkt. No. 14-2.) After she moved out, her granddaughters lived in the home and the property has been a family home used by family members and never used as a rental property. (Id.) These facts are raised for the first time in Plaintiff's opposition and in the accompanying declaration of Zarah Kimble and not in the complaint. Facts outside the complaint are not proper for the Court to consider on a Rule 12(b)(6) motion. See Lee, 250 F.3d at 688. Therefore, the Court declines to consider Plaintiff's additional facts not alleged in the complaint.

The parties do not dispute that Regulation X applies only to a "mortgage loan that is secured by a property that is a borrower's principal residence." 12 C.F.R. § 1024.30(c). While the property may have been Smith's principal residence at the time she submitted her application, it is not alleged; therefore, the Court GRANTS Defendant's motion to dismiss for lack of standing with leave to amend.[4]

Because it appears the Plaintiff may be able to amend the deficiency of the standing allegations, the Court continues to address Defendant's remaining arguments.

### 2. Actual Damages

Defendant argues that the Regulation X claims fail to state a claim because Plaintiff has not plausibly demonstrated that she suffered damages as a result of the purported RESPA violations. Plaintiff disagrees arguing that she alleged foreclosure fees assessed against her in the letter dated May 25, 2017 and she has also incurred administrative costs due to SLS's alleged violations of RESPA. In reply, Defendant argues that Plaintiff has failed to allege that any foreclosure fees assessed against her loan were causally related to SLS's alleged violation of RESPA. Moreover, because Plaintiff has not demonstrated she was entitled to loss mitigation assistance and since she was in default, she would have incurred at least a portion of the administrative expenses regardless of whether there was a violation of RESPA.

RESPA allows an individual to recover "any actual damages to the borrower as a result of the failure [to comply with provisions of RESPA]." 12 U.S.C. § 2605(f)(1)(A); Ponds v. Nationstar Mortg., LLC, Case No. 15-8693-DMG(JPRx), 2016 WL 3360675, at *5 (C.D. Cal. June 3, 2016) (citation omitted) (Plaintiff must allege "actual pecuniary damages as a result of the RESPA violation."); see also Jenkins v. JP

---

[4] In opposition, Plaintiff argues that the property is still considered a principal residence under RESPA since the home is being used by the family after Smith moved into a nursing care facility in October 2015 and the property is not used for business, commercial or agricultural purposes. In reply, Defendant argues Smith has not alleged and can no longer show that she actually resides and intends to remain at the property. The Court declines to consider the hypothetical allegations that are not yet alleged in the complaint and reserves the issue for further briefing in the event Defendant files another motion to dismiss.

Morgan Chase Bank, N.A., 216 Cal. App. 4th 497, 532 (2013) (disapproved on other grounds by Yvanova v. New Century Mort. Corp., 62 Cal. 4th 919 (2016)). Actual damages must include harms caused by RESPA violations, and "not harms generally resulting from a plaintiff's default and the foreclosure of his or her home." Jenkins, 216 Cal. App. 4th at 532. "Actual damages may include, but are not limited to, (1) out-of-pocket expenses incurred dealing with the RESPA violation, (2) lost time and inconvenience to the extent it resulted in actual pecuniary loss, and (3) late fees." Wanger v. EMC Mort. Corp., 103 Cal. App. 4th 1125, 1137 (2002).

In this case, the complaint alleges that the May 25, 2016 letter from SLS listed a breakdown of fees assessed against Plaintiff's account to include $4,909.63 in foreclosure fees/costs, $249.70 in property inspections; $25.00 for payoff statements; and $11.00 on corporate advances. (Dkt. No. 1, Compl. ¶ 153.) According to the complaint, the foreclosure fees were improperly being assessed against her while her loss mitigation application was being reviewed in violation of 12 C.F.R. §§ 1024.41(f). As discussed below, the Court concludes that Plaintiff has not alleged a violation of 12 C.F.R. § 1024.41(f); therefore, her alleged actual damages arising alleged improper dual tracking cannot assert a claim for damages. However, Plaintiff further claims that Defendant had no intention of processing her loss mitigation application, (id. ¶ 165), indicated by its failure to comply with the regulations; therefore, if Defendant had complied with RESPA, then the foreclosure fees would not have been assessed against her. Thus, Plaintiff has sufficiently alleged that her foreclosure fees were due to SLS's alleged violations of RESPA.

She also asserts actual damages in the form of administrative costs such as "postage, travel expenses, photocopying, scanning, and facsimile expenses pursuing the loss mitigation process." (Id. ¶¶ 163-64.) The complaint alleges that SLS violated 12 C.F.R. § 1024.41(c) numerous times from August 2014 until August 19, 2016 when SLS failed to provide her with notice in writing regarding its determination of which loss mitigation options, if any, it would offer to her within 30 days of receiving a loss mitigation application. (Id. ¶¶ 85- 157.) During this time period, Plaintiff had to

resubmit her loss mitigation application several times, and resubmit documents she already submitted. She spent considerable time and effort and administrative costs, pursuing the loss mitigation process with SLS which she would not have spent had SLS complied with Regulation X. (Id. ¶¶ 163, 164.) The Court concludes that Plaintiff has sufficiently alleged actual damages arising from the alleged RESPA violations.

### 3. 12 C.F.R. § 1024.41(c)

Defendant contends that under § 1024.41(c), a servicer is only required to provide a borrower a written decision within 30 days of receiving a "complete" application. Since Plaintiff acknowledges that SLS did not deem her applications complete, she cannot plausibly argue a violation of § 1024.41(c) absent a complete application. In response, Plaintiff argues she asserts a claim under § 1024.41(c) because she alleges her applications were complete when she provided SLS with the requested information.

12 C.F.R. § 1024.41(c) provides the following:

(c) Evaluation of loss mitigation applications.

(1) Complete loss mitigation application. If a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving a borrower's complete loss mitigation application, a servicer shall:

    (i) Evaluate the borrower for all loss mitigation options available to the borrower; and

    (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

12 C.F.R. § 1024.41(c)(1). A complete application is one for which the servicer has received all of the required documents. 12 C.F.R. § 1024.41(b)(1).

The complaint alleges at least five loan modification applications Smith

submitted to her original servicer, IndyMac and then to SLS, her current servicer. (Dkt. No. 1, Compl. ¶¶ 74, 79, 90, 111, 142.) Among these applications, at least one, the December 16, 2014 application is alleged to be "complete." On December 30, 2014, when SLS requested two missing documents from Plaintiff, she immediately faxed the missing information the next day on December 31, 2014. (Id. ¶¶ 90, 94.) However, around January 19, 2015, SLS denied her application because she failed to provide the requested documents. (Id. ¶ 102.) Thus, the Court concludes that Plaintiff has alleged she provided a "complete" loan modification application to SLS sufficient to allege a violation of § 1024.41(c).

### 4. 12 C.F.R. § 1024.41(f)

Defendant avers that a violation of § 1024.41(f) precludes a servicer from making the "first notice or filing required by applicable law for any judicial or non-judicial process" while a borrower has a complete loan modification application pending; however, in this case, Defendant did not institute nonjudicial foreclosure proceedings by recording a notice of default and cannot be subject to § 1024.41(f). Plaintiff disagrees arguing that SLS sent at least 11 default notices to Plaintiff during January 2015 and May 2016 and started charging fees for foreclosure no later than May 2016; these acts violates RESPA prohibition against dual tracking. She complains that SLS should not be able to avoid RESPA by sending unrecorded notices and charging foreclosure fees.

"A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process" while a complete loss mitigation application is pending. 12 C.F.R. § 1024.41(f). The Consumer Financial Protection Bureau's ("CFPB") Official Bureau Interpretations provide guidance on what constitutes the first notice or filing under § 1024.41(f)

> 1. . . . Such notices or filings include, for example, a foreclosure complaint, a notice of default, a notice of election and demand, or any other notice that is required by applicable law in order to pursue acceleration of a mortgage loan obligation or sale of a property securing a mortgage loan obligation. . . .
>
> iv. A document provided to the borrower but not initially required to be

- 13 -

> filed, recorded, or published is not considered the first notice or filing on the sole basis that the document must later be included as an attachment accompanying another document that is required to be filed, recorded, or published to carry out a foreclosure.

12 C.F.R. Pt. 1024. Supp. I, § 1024.41(f) (Jan. 10, 2014).[5] It specifically states that an unrecorded notice of default does not constitute a "first notice" under § 1024.41(f). The Official Bureau Interpretations refer to state law to determine when a non-judicial foreclosure process begins. In California, the recording of the "notice of default" starts the non-judicial foreclosure proceeding to begin. See Cal. Civil Code § 2924.

The complaint has not alleged that SLS recorded a notice of default with the San Diego County Recorder's Office. Instead, SLS has sent notices of default and intent to foreclose directly to Smith and charged her foreclosure fees. However, according to the CFPB's interpretation, an unrecorded notice of default does not constitute the "first notice" and Smith has not provided any legal support that imposing foreclosure fees or sending letters entitled "notice of default" to a borrower constitute a "first notice or filing required by applicable law." Accordingly, Plaintiff fails to state a violation of § 1024.41(f).

### 5. Pattern or Practice

Defendant argues that Plaintiff has only conclusorily alleged that SLS has engaged in a "pattern or practice" of violating Regulation X. (See Dkt. No. 1, Compl. ¶¶ 6, 62 ("SLS has engaged in a pattern and practice of violating these regualtions in numerous ways.") Moreover, Plaintiff's citation to other complaints submitted to the CFPB does not amount to noncompliance and not sufficient to demonstrate a pattern or practice. Plaintiff respond that SLS's use of the seventeen "review" letters, itself, constitutes a pattern or practice that violates 12 C.F.R. § 1024.41(b) because the letters do not state whether her application was complete.

---

[5] Congress granted the CFPB exclusive authority to interpret the federal consumer financial laws and deference shall be granted under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc., 60 F. Supp. 3d 1082, 1091 (C.D. Cal. 2014).

- 14 -

RESPA allows an individual to recover "actual damages" as a result of a violation of Regulation X but also allows a borrower to recover "additional damages" of up to $2,000 if the borrower can demonstrate a "pattern or practice of noncompliance." See 12 U.S.C. § 2605(f)(1)(A) (actual damages); 12 U.S.C. § 2605(f)(1)(B) (additional damages).) The term "pattern or practice" under RESPA is defined according to the usual meaning of the words. In re Maxwell, 281 B.R. 101, 123 (D. Mass. 2002) (quoting Cortez v. Keystone Bank, Inc., No. 98–2457, 2000 WL 536666 at *10 (E.D. Pa. May 2, 2000)). "The term suggests a standard or routine way of operating." Id. While one or two RESPA violations do not establish a "pattern or practice", see id.; Garcia v. Wachovia Mort. Corp., 676 F. Supp. 2d 895, 909 (2009); five violations constitute a "pattern or practice." See Ploog v. HomeSide Lending, Inc., 209 F. Supp. 2d 863, 868-69 (N.D. Ill. 2002).

Here, the complaint alleges that over a period of 22 month period, Smith received seventeen allegedly unlawful letters that stated her application was under review without specifying whether her application was either complete or incomplete.[6] (Dkt. No. 1, Compl. ¶ 83.) Plaintiff has sufficiently stated a "pattern or practice of noncompliance" subject to 12 U.S.C. § 2605(f)(1)(B).

**D.  UCL**

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).

**1.  Standing**

Defendant argues that Plaintiff does not have standing to assert a UCL claim

---

[6]The parties also dispute whether other complaints against SLS that were submitted to the CFPB can be used to allege a "pattern or practice." The complaint cites five different complaints against SLS to the CFPB concerning loan modification issues. (Dkt. No. 1, Compl. ¶ 14.) Since Plaintiff's allegations of alleged RESPA violations against SLS are sufficient to allege a "pattern or practice", the Court need not address this issue.

because she has not alleged an economic injury. Plaintiff claims she has alleged an injury in fact and loss of property by being subject to marked up charges and foreclosure fees.[7]

Section 17204 requires that a plaintiff must demonstrate injury-in-fact and loss of money or property caused by the unfair competition. Cal. Bus. & Prof. Code § 17204. The purpose of this provision is "to confine standing to those actually injured by a defendant's business practices . . . . ." Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 321 (2011). "To satisfy the narrower standing requirements imposed by Proposition 64, a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury-in-fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." Id. at 322. Marked up charges and excess fees are sufficient to establish standing under the UCL. See Sullivan v. Washington Mut. Bank, FA, No. C-09-2161 EMC, 2009 WL 3458300, at *4 (N.D. Cal. Oct. 23, 2009) (improper finance charges would constitute both injury in fact and loss of money).

The complaint alleges Smith has been assessed thousands of dollars in fees, had her credit ruined, and has expended money on postage, photocopying and faxing in response to SLS's correspondence. (Dkt. No. 1, Compl. ¶¶ 164-65.) She alleges that SLS failed to comply with Regulation X by failing to inform her whether her application was complete, required her to resubmit documents already submitted, and failed to evaluate her for loss mitigation options. She also claims that SLS never intended to evaluate her loss mitigation options as SLS was also informally initiating foreclosure proceedings. (Id. ¶¶ 67-68.) Plaintiff alleges that she was assessed marked up charges, excessive fees, and incurred administrative costs due to Defendant's failure to properly comply with the loss mitigation regulations under RESPA. Thus, Plaintiff

---

[7]While Plaintiff argues she also alleged a loss in equity in her property, it is not claimed in the complaint.

has alleged facts to assert standing to assert a UCL claim.

**2. Unlawful Prong**

Defendant argues that the unlawful prong claim fails because Plaintiff has not stated a viable claim for violation of Regulation X. Plaintiff disagrees arguing she has stated a Regulation X claim.

The unlawful prong of the UCL incorporates "violations of other laws and treats them as unlawful practices." Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999). This prong creates an "independent action when a business practice violates some other law." Walker v. Countrywide Home Loans, Inc., 98 Cal. App. 4th 1158, 1169 (2002). A UCL claim "stands or falls depending on the fate of antecedent substantive causes of action." Krantz v. BT Visual Images, 89 Cal. App. 4th 164, 178 (2001).

Here, because the Court GRANTS Defendant's motion to dismiss as to the RESPA claim, the Court, at this time, also GRANTS the claim under the unlawful prong of the UCL.

**3. Unfair Prong**

SLS contends that Plaintiff has not asserted facts to establish that it acted "unfairly" because Plaintiff failed to demonstrate that SLS had an obligation to review her application. In response, Plaintiff argues that SLS's practice of providing confusing, conflicting, and untimely information constitutes unfair conduct because it violates the purpose of RESPA which is to ensure consumers are provided with more information concerning the settlement process.

A business act or practice is "unfair" when the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 187 (1999). Where a claim of an unfair act or practice is predicated on public policy, Cel-Tech requires that the public policy which is a predicate to the action must be "tethered to specific constitutional, statutory or

regulatory provisions." Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1166 (2000) (Cel-Tech holding that "*any* claims of unfairness under the UCL should be defined in connection with a legislatively declared policy" also applied to UCL actions brought by consumers); Churchill Village, L.L.C. v. General Electric Co., 169 F. Supp. 2d 1119, 1130 & fn. 10 (N.D. Cal. 2000) (holding Cel-Tech's definition of unfair also applies to consumer UCL actions).

Here, Plaintiff's allegations that SLS's practices on processing loss mitigation applications violate the policy underlying RESPA which is to ensure consumers are provided with "greater information during the settlement process and to protect consumers against unwarranted charges." (Dkt. No. 1, Compl. ¶ 35.) Specifically, the policy is tethered to Regulation X which was implemented by the CFPB to provide procedural protections for borrowers as they seek out loss mitigation options as an alternative to foreclosure. (Id. ¶¶ 39, 40.) Thus, Plaintiff has sufficiently stated a claim under the unfair prong of the UCL as she has asserted a violation of a public policy that is tethered to Regulation X and RESPA.

### 4. Fraudulent Prong

Defendant asserts that Plaintiff's claim that SLS's conduct in reviewing her application was fraudulent because it had no intention of offering her a loss mitigation alternative is undermined by her acknowledgment that SLS actually reviewed her last application and determined she was ineligible based on her income. Defendant also argues that Plaintiff has failed to comply with the heightened pleading required under Rule 9(b). Plaintiff responds that she alleged SLS's "deluge of conflicting correspondence was likely to deceive consumers" because while SLS offered or invited Plaintiff to submit a loan modification application, it then created barrier after barrier to prevent her from completing an application to its satisfaction or actually obtaining a loss mitigation option.

To state a claim under the fraudulent prong of the UCL, "it is necessary only to show that members of the public are likely to be deceived" by the business practice. Prakashpalan v. Engstrom, Lipscomb and Lack, 223 Cal. App. 4th 1105, 1134 (2014).

- 18 -

"Unless the challenged conduct targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer." Puentes v. Wells Fargo Home Mortg., Inc., 160 Cal. App. 4th 638, 645 (2008) (quotations and citation omitted).

In federal court, where a plaintiff alleges fraud or a claim is grounded in fraud, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Ninth Circuit has held that Rule 9(b) applies to state-law causes of action, including the UCL. Vess v. Ciba-Geigy Corp., U.S.A., 317 F.3d 1097, 1103 (9th Cir. 2003); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (applying Rule 9(b) particularity requirement to UCL claim grounded in fraud).

Here, Plaintiff does not make an allegation of fraud nor do the allegations sound in fraud. Therefore, the requirements of Rule 9(b) do not apply. In compliance with Rule 8, Plaintiff has alleged facts that members of the public are likely to be deceived. Plaintiff claims that SLS's process of offering and inviting consumers to apply for loss mitigation options, and then creating blocks to be evaluated for loss mitigation options are likely to deceive members of the public. As such, Plaintiff has stated a claim under the fraudulent prong of the UCL.

Alternatively, even if Plaintiff's allegations are construed to sound in fraud, she has complied with the heightened pleading requirement under Rule 9(b).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Odom v. Microsoft Corp., 486 F.3d 541, 553 (9th Cir. 2007) (internal quotation marks omitted).

The complaint alleges that SLS sent her with a deluge of conflicting letters. As to each letter, Plaintiff provides the date and the content of each conflicting letter. This satisfies the heightened pleading requirement under Rule 9(b).

In sum, the Court GRANTS Defendant's motion to dismiss the UCL based on the unlawful prong and DENIES Defendant's motion to dismiss the UCL claim based on the unfair and fraudulent prongs.

**Conclusion**

Based on the above, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss with leave to amend. Specifically, the Court GRANTS Defendant's motion to dismiss the Regulation X cause of action for lack of standing and the CLRA claim as unopposed, and GRANTS in part DENIES in part the UCL claim. Plaintiff shall file an amended complaint within seven days of the filed date of the order. The hearing date set for May 5, 2017 shall be **vacated.**

IT IS SO ORDERED.

DATED: May 3, 2017

HON. GONZALO P. CURIEL
United States District Judge